**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

ABRAHAM BAGINSKY,

               Plaintiff,

               v.

ZYNGA, INC.,

               Defendant.

Case No. 1:25-cv-1992-ALC

## <u>MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S<br>MOTION TO COMPEL ARBITRATION</u>

**TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT ................................................................................................ 1

RELEVANT BACKGROUND ................................................................................................. 2

      A.    *Zynga Poker* for Apple iOS ................................................................................. 2

      B.    Plaintiff Agreed to the Binding Arbitration Agreement Contained in the
           Terms of Service ................................................................................................. 6

      C.    Zynga's Terms of Service and Arbitration Agreement Plaintiff Agreed To ........... 7

      D.    The Parties Agree That Their Dispute Should Be Resolved In Arbitration .......... 9

PLAINTIFF'S ALLEGATIONS ............................................................................................. 12

LEGAL STANDARD ............................................................................................................ 13

ARGUMENT .......................................................................................................................... 15

      A.    Plaintiff And Zynga Entered Into A Valid Arbitration Agreement. ...................... 16

      B.    The Arbitration Agreement's Broad Language Covers Plaintiff's Claims .......... 21

      C.    The Court Should Dismiss or, in the Alternative Stay the Proceeding
           Pending Arbitration ........................................................................................... 24

CONCLUSION ....................................................................................................................... 25

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*ACE Cap. Re Overseas Ltd. v. Cent. United Life Ins. Co.*,
  307 F.3d 24 (2d Cir. 2002)..................................................................................................15, 24

*AT&T Mobility LLC v. Concepcion*,
  563 U.S. 333 (2011).......................................................................................................................13

*Begonja v. Vornado Realty Tr.*,
  159 F. Supp. 3d 402 (S.D.N.Y. 2016).........................................................................................14

*Bell v. Cendant Corp.*,
  293 F.3d 563 (2d Cir. 2002).........................................................................................................18

*Bernardino v. Barnes & Noble Booksellers, Inc.*,
  No. 17-CV-04570 (LAK) (KHP), 2017 WL 7309893 (S.D.N.Y. Nov. 20,
  2017), *R. & R. adopted as modified*, No. 17-CV-4570 (LAK), 2018 WL
  671258 (S.D.N.Y. Jan. 31, 2018).................................................................................................18

*Branch v. ATR New York LH, Inc.*,
  No. 2:23-CV-09456 (JMA) (LGD), 2025 WL 1400063 (E.D.N.Y. May 14,
  2025) ...............................................................................................................................................22

*Brennan v. Opus Bank*,
  796 F.3d 1125 (9th Cir. 2015) .....................................................................................................23

*Buckeye Check Cashing, Inc. v. Cardegna*,
  546 U.S. 440 (2006).......................................................................................................................13

*Ciccio v. SmileDirectClub, LLC*,
  2 F.4th 577 (6th Cir. 2021) ..........................................................................................................23

*Cloney's Pharmacy, Inc. v. Wellpartner, Inc.*,
  No. 1:23-CV-10088-MKV, 2024 WL 4349291 (S.D.N.Y. Sept. 30, 2024)............................14

*Coulter v. Experian Info. Sols., Inc.*,
  No. 20-CV-1814, 2021 WL 735726 (E.D. Pa. Feb. 25, 2021) .................................................19

*Dowe v. Leeds Brown L., P.C.*,
  419 F. Supp. 3d 748 (S.D.N.Y. 2019).........................................................................................24

*Fteja v. Facebook, Inc.*,
  841 F. Supp. 2d 829 (S.D.N.Y. 2012).........................................................................................19

*Garcia v. Nabfly, Inc.*,
No. 23 Civ. 1162 (PGG), 2024 WL 1795395 (S.D.N.Y. Apr. 24, 2024) .........................19, 20

*Garten v. Kurth*,
265 F.3d 136 (2d Cir. 2001)...................................................................................................23

*Henry Schein, Inc. v. Archer & White Sales, Inc.*,
586 U.S. 63 (2019).........................................................................................................14, 21

*Ipcon Collections LLC v. Costco Wholesale Corp.*,
698 F.3d 58 (2d Cir. 2012)....................................................................................................24

*Jones-Bey v. JPay Inc.*,
No. 2:17-CV-12545, 2019 WL 6337770 (E.D. Mich. Oct. 10, 2019)....................................19

*JPay, Inc. v. Kobel*,
904 F.3d 923 (11th Cir. 2018) ..............................................................................................23

*Kern v. StubHub Inc.*,
No. 24 CIV. 871 (AT), 2024 WL 5283923 (S.D.N.Y. Dec. 17, 2024)....................................19

*Kutluca v. PQ New York Inc.*,
266 F. Supp. 3d 691 (S.D.N.Y. 2017)....................................................................................20

*Lee v. Engel Burman Grande Care at Jericho, LLC*,
No. 20CV3093-RPK-RER, 2021 WL 3725986 (E.D.N.Y. Aug. 23, 2021) ............................15

*Lewis v. Samsung Elecs. Am., Inc.*,
No. 1:22-CV-10882 (JLR), 2023 WL 7623670 (S.D.N.Y. Nov. 14, 2023) ............................14

*Mackris v. O'Reilly*,
No. 17 CIV. 9483 (DAB), 2019 WL 11000205 (S.D.N.Y. Mar. 6, 2019) ..............................23

*McPherson v. Bloomingdale's, LLC*,
No. 23CV1084JMAARL, 2023 WL 8527462 (E.D.N.Y. Dec. 8, 2023)..................................24

*Meyer v. Uber Techs., Inc.*,
868 F.3d 66 (2d Cir. 2017).................................................................................14, 18, 19, 20

*Micheli & Shell, LLC v. Grubhub Inc.*,
588 F. Supp. 3d 483 (S.D.N.Y. 2022)..............................................................................13, 22

*Parrella v. Orange Rabbit, Inc.*,
No. 20-CV-9923 (RA), 2021 WL 4462809 (S.D.N.Y. Sept. 29, 2021) ..................................23

*Plazza v. Airbnb, Inc.*,
289 F. Supp. 3d 537 (S.D.N.Y. 2018).....................................................................................20

*Ralph Lauren Corp. v. U.S. Polo Ass'n, Inc.*,
　No. 13 CIV. 7147, 2014 WL 4377852 (S.D.N.Y. Sept. 4, 2014)...........................................13

*Rent-A-Ctr., W., Inc. v. Jackson*,
　561 U.S. 63 (2010)..................................................................................................14, 24

*Richardson v. Coverall N. Am., Inc.*,
　811 F. App'x 100 (3d Cir. 2020) ........................................................................................23

*Rost v. Liberty Coca-Cola Beverages, LLC*,
　No. 20 CV 10559 (VB), 2021 WL 3723092 (S.D.N.Y. Aug. 23, 2021) .................................24

*Shirley v. Rocket Mortgage*,
　No. 2:22-cv-13007, 2022 WL 2541123 (E.D. Mich. July 7, 2022).........................................19

*Swift v. Zynga Game Network, Inc.*,
　805 F. Supp. 2d 904 (N.D. Cal. 2011) ..................................................................................19

*Teta v. Go New York Tours, Inc.*,
　738 F. Supp. 3d 502 (S.D.N.Y. 2024)....................................................................................15

*Troia v. Tinder, Inc.*,
　No. 4:19-CV-1647 RLW, 2020 WL 619855 (E.D. Mo. Feb. 10, 2020)...................................19

*Weiss v. Travex Corp.*,
　No. 02 CIV. 2380 (SAS), 2002 WL 1543875 (S.D.N.Y. July 12, 2002) .........................23, 24

*Xiaohong v. Dingledine*,
　No. 23 CIV. 11094 (GHW) (RFT), 2025 WL 1604001 (S.D.N.Y. June 6,
　2025) .................................................................................................................................15, 25

**Statutes**

Federal Arbitration Act, 9 U.S.C. § 1 et seq. .......................................................................... *passim*

N.Y. Gen. Bus. Law § 349 (2) ...............................................................................................13, 21

N.Y. Gen. Bus. Law § 350 (3) ...............................................................................................13, 21

iv

Defendant Zynga, Inc. ("Defendant" or "Zynga"), pursuant to the Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 1 et seq., respectfully moves to compel arbitration of all claims asserted in Plaintiff's Second Amended Complaint ("SAC," ECF No. 9) and to either dismiss or stay this action pending the outcome of the arbitration. In support of this Motion, Zynga submits this memorandum of law, together with: (i) the Declaration of Nicholas Lam ("Lam Decl."); (ii) Zynga's Terms of Service ("TOS"), which includes a mandatory arbitration agreement (the "Arbitration Agreement") (attached hereto as Exhibit 1); and (iii) the Declaration of Michael C. Lynch ("Lynch Decl.").

## PRELIMINARY STATEMENT

Plaintiff brings this action despite repeatedly agreeing to resolve his dispute with Zynga through binding arbitration.  Indeed, less than two weeks before filing this action in court, Plaintiff's counsel confirmed that Zynga's TOS included an arbitration agreement—which required Plaintiff's disputes to be resolved by an arbitrator under JAMS rules—and claimed that they would "file a demand next week."  (Lynch Decl., Ex. C.)  But instead of filing that demand, Plaintiff filed his Initial Complaint (ECF No. 1) (the "Initial Complaint") against Zynga and Take-Two Interactive Software, Inc. ("Take-Two") in this Court, prompting Zynga to remind Plaintiff's counsel again that their client's claims were subject to binding arbitration under Zynga's TOS and the Arbitration Agreement.  (*Id.* Ex. F.)

In response, Plaintiff's counsel explicitly stated that they "agreed to arbitrate" and that arbitration under JAMS rules was "clearly appropriate."  (*Id.* Exs. G, I.)  Yet rather than proceed to arbitration, Plaintiff continued to litigate, filing two amended complaints, and moving for default judgment. (*See* ECF Nos. 7, 9, 16-17.)  Despite the unambiguous acknowledgements that Plaintiff's disputes are subject to binding arbitration, Plaintiff now seeks to avoid arbitration all together.

But Plaintiff admits, and the record leaves no doubt that Plaintiff assented to Zynga's Terms of Service[1], which includes an explicit, binding Arbitration Agreement. Plaintiff expressly concedes that he "chose to play Zynga Poker *and agreed to the terms of service*" (SAC ¶ 80) (emphasis added). And Plaintiff reaffirmed his acceptance of the TOS each time he logged into the game on the *Zynga Poker* App. (Lam Decl. ¶¶ 8–19.)

That some of Plaintiff's claims sound in fraud does not excuse his decision to violate the TOS and Arbitration Agreement. Courts in this jurisdiction and across the country routinely compel arbitration of fraud-based claims where, as here, the allegations concern the broader relationship between the parties—not the arbitration clause itself.

Accordingly, under well-established precedent and the FAA, 9 U.S.C. § 4, Zynga respectfully requests that this Court compel Plaintiff's claims to arbitration and dismiss or, in the alternative, stay this action pending the outcome of arbitration.

## RELEVANT BACKGROUND

### A.    *Zynga Poker* for Apple iOS

Zynga develops and publishes online and mobile video games, including popular franchises such as *Words With Friends* and *FarmVille*. (*Id*. ¶ 3.) Among its offerings is *Zynga Poker*, a free-to-play game that allows users to play virtual poker. (*Id*. ¶¶ 3-4.) Just as players are not required to pay money to play *Zynga Poker*, players cannot win real money in the game. (*Id*. ¶ 4.)

---

[1] Zynga uses the same Terms of Service as its parent company, Take-Two Interactive Software, Inc. The Terms of Service define "Take-Two," "we," "us," and "our" to include all Take-Two entities and labels, of which Zynga (and *Zynga Poker*) is one. Additionally, because Plaintiff accessed his account on March 20, 2024, the Terms of Service attached as Exhibit 1 to this Motion, are the Terms of Service that were in effect during the period Plaintiff played *Zynga Poker* and govern Plaintiff's dispute with Zynga. Take-Two (and by extension, Zynga) has since updated its Terms of Service (effective February 28, 2025).

*Zynga Poker* is playable on a variety of platforms, including the *Zynga Poker* App for Apple iOS.  (*Id.* ¶ 5.)  To play the game using the *Zynga Poker* App, users must accept Zynga's TOS, which includes a mandatory Arbitration Agreement.  (*Id.* ¶ 6.)  A user of the *Zynga Poker* App cannot access their account or play the game without first accepting the TOS and assenting to the Arbitration Agreement.  (*Id.* ¶ 7.)

Because Plaintiff played *Zynga Poker* through the *Zynga Poker* App—wherein he accepted Zynga's TOS, including the Arbitration Agreement—Zynga describes the user experience for the *Zynga Poker* App on Apple iOS below.

**Acceptance of Zynga's Terms of Service Through the Zynga Poker App (Apple iOS)**

To download the *Zynga Poker* App on an Apple mobile device, a player must first search for the game on the Apple App Store.  (*Id.* ¶ 8.)  In the Apple App Store, players are presented with the ability to view Zynga's TOS even before downloading the *Zynga Poker* App.  (*Id.* ¶ 9.) The Apple App Store provides a description of the *Zynga Poker* App and displays the following notice:    "Use    of    this    application    is    governed    by    Zynga's    Terms    of Service,    found    at    https://www.take2games.com/legal."    (*Id.* ¶ 10.)    The    URL— https://www.take2games.com/legal—directs potential players to a web page where potential players can view Zynga's TOS, including the Arbitration Agreement.  (*Id.* ¶ 11.)  The following image shows how this notice was presented in the Apple App Store:



*(Fig. 1 to Lam Decl., Screenshot of Zynga Poker listing in Apple's iOS App Store, with red box highlighting the Terms of Service notice.)*

After visiting the Apple App Store, a potential player must affirmatively download and install the *Zynga Poker* app on their device.  (*Id*. ¶ 12.)  Upon launching the *Zynga Poker* App, the player is presented with a two-step login flow.  (*Id*. ¶ 13.)  The first screen prompts the user to either "[l]ogin with existing account" or "[c]reate new account."  (*Id.*)  Regardless of whether the user chooses to create a new account or log in with an existing account, the *Zynga Poker* App then displays a second screen with multiple account access buttons.  (*Id*. ¶ 14.)  A fixed banner is persistently present directly above the buttons on the second screen, and states:  "[b]y clicking one of the buttons below, you agree to Zynga's <u>Terms of Service</u>."  (*Id*. ¶ 15.)  The phrase "<u>Terms of Service</u>" is presented in bright purple font, is underlined, and is hyperlinked to the then-current version of the TOS which includes the Arbitration Agreement.  (*Id*. ¶¶ 16–17.)

4





*(Figs. 4 and 5 to Lam Decl., Screenshot of the second screen of the Zynga Poker App on Apple iOS login screen for creating a new account, showing fixed banner which includes "Zynga's Terms of Service," hyperlinked; Screenshot of the second screen of the Zynga Poker App on Apple iOS login screen for existing accounts, showing fixed banner which includes "Zynga's Terms of Service," hyperlinked.)*

Only after clicking one of the buttons below the persistent banner can the user play the game.  (*Id.* ¶ 18.)

At any time after the player creates an account or logs back into the game using their existing account, the player can access the full TOS—including the Arbitration Agreement—by clicking the gear icon in the app's main menu and by navigating to the TOS button, which if clicked, opens the then-current version of the TOS (containing the Arbitration Agreement) in a separate browser window.  (*Id.* ¶ 19.)

5





*(Fig. 6 to Lam Decl., Screenshot of Zynga Poker App on Apple iOS gear icon (red box added);*
*Screenshot of Zynga Poker App on Apple iOS settings menu showing Customer Support section with a*
*hyperlinked button to Zynga's Terms of Service (red box added).)*

### B.    Plaintiff Agreed to the Binding Arbitration Agreement Contained in the Terms of Service

Plaintiff alleges that he "has been a Zynga user since early 2024, specifically playing the online poker game offered by Zynga ('Zynga Poker')." (SAC ¶ 3; *see also* ¶ 15 ("Mr. Baginsky began playing Zynga Poker in 2024."); ¶ 32 ("Mr. Baginsky became a user of Zynga Poker in 2024.")) However, using Plaintiff's email that he provided to Zynga, Zynga was able to locate his *Zynga Poker* account. (Lam Decl. ¶ 20.) Zynga's records indicate that Plaintiff began playing *Zynga Poker* on or about April 30, 2008 and played the game periodically since then. (*Id.* ¶ 21.)

6

After a period of inactivity, Zynga's records confirm that Plaintiff accessed his *Zynga Poker* account through the *Zynga Poker* App on March 20, 2024. (*Id*. ¶ 22.) According to Plaintiff, he "chose to play Zynga Poker and agreed to the terms of service." (SAC ¶ 80; *see also id*. ¶ 89). Zynga's records confirm that Plaintiff made purchases of Virtual Currency on *Zynga Poker* throughout 2024 and 2025. (Lam Decl. ¶ 23.)

Plaintiff's SAC admits that he agreed to Zynga's TOS (SAC ¶¶ 80, 89) because as illustrated above, Plaintiff could not play on the *Zynga Poker* App unless he clicked one of the account access buttons displayed below the persistent banner informing him that by doing so he was agreeing to Zynga's TOS. (Lam Decl. ¶ 24.) When Plaintiff agreed to the TOS, he agreed to the Arbitration Agreement contained therein.

## C.    Zynga's Terms of Service and Arbitration Agreement Plaintiff Agreed To

The first section of the TOS contains clear and conspicuous notice of the Arbitration Agreement:

> THIS AGREEMENT CONTAINS A MANDATORY ARBITRATION CLAUSE AND A WAIVER OF CLASS ACTION AND JURY TRIAL RIGHTS FOR ALL USERS RESIDING IN THE UNITED STATES….YOU WILL BE BOUND BY THE ARBITRATION AGREEMENT, WHICH MEANS THAT YOU AND TAKE-TWO WILL BE REQUIRED TO RESOLVE ANY DISPUTE, SUBJECT TO LIMITED EXCEPTIONS, BY FINAL AND BINDING INDIVIDUAL ARBITRATION.

(Ex. 1, at 1–2.)

The Arbitration Agreement itself provides that if the parties cannot informally resolve their dispute, then it will be resolved in binding arbitration:

> You and Take-Two agree that, if not resolved through the informal negotiation process described below, any Disputes between us shall be exclusively resolved by individual, binding arbitration under this Arbitration Agreement.

7

(*Id*, at 21.)

"Disputes" is broadly defined as:

> …any dispute, claim, or controversy arising from or related to the Services, including those related to the formation, breach, termination, enforcement, scope, validity, or applicability of the Agreement or the Arbitration Agreement, or your rights under those agreements.

(*Id.*).

The Arbitration Agreement incorporates the JAMS Streamlined Arbitration Rules and Procedures, the U.S. Federal Arbitration Act and federal arbitration law:

> If we cannot resolve the Dispute informally, the Dispute…will be resolved exclusively via binding individual arbitration conducted by the Judicial Arbitration Mediation Services, Inc. ("JAMS") subject to the terms in this Arbitration Agreement, the U.S. Federal Arbitration Act and federal arbitration law.

(*Id.* at 23.)

The Arbitration Agreement delegates gateway issues of arbitrability to the arbitrator:

> The arbitrator – not a federal, state, or local court, or government agency – shall have exclusive authority to resolve any Disputes, including those related to the interpretation, applicability, enforceability, or formation of this Arbitration Agreement, and any claim that all or part of the Arbitration Agreement is void or voidable. The arbitrator shall also have authority to determine all threshold arbitrability issues….

(*Id.* at 21.)    The JAMS Streamlined Arbitration Rules, which pursuant to the Arbitration Agreement apply to all arbitrations conducted thereunder, includes a similar delegation clause.[2]

Additionally, the Arbitration Agreement allows *Zynga Poker* players the opportunity to opt out the Arbitration Agreement if they so choose:

---

[2] *See* JAMS Streamlined Arbitration Rules & Procedures, R8(b). ("Jurisdictional and arbitrability disputes, including disputes over the formation, existence, validity, interpretation or scope of the agreement under which Arbitration is sought, and who are proper Parties to the Arbitration, shall be submitted to and ruled on by the Arbitrator. The Arbitrator has the authority to determine jurisdiction and arbitrability issues as a preliminary matter.")

> You have the right to opt out of this Arbitration Agreement.  You must notify us in writing within 30 days of the date that you first accept this Agreement ("**Opt-Out Notice**") unless a longer period is required by applicable law.

(*Id.* at 22) (emphasis original). Finally, the TOS states that the Arbitration Agreement shall be "governed by, and construed under, the laws of the State of New York without regard to conflict of law rules." (*Id*. at 19.)

### D.       The Parties Agree That Their Dispute Should Be Resolved In Arbitration

Even before Plaintiff filed this action, he unambiguously acknowledged that his alleged disputes were subject to arbitration and agreed to arbitrate with Zynga.

In early 2025, counsel for Plaintiff and Defendants participated in several discussions over phone calls and through written correspondence.  On February 27, 2025, Plaintiff's counsel wrote to Defendant, stating that they were "following up in a good faith effort to resolve this..." and asked Defendant's counsel to "[p]lease confirm whether arbitration would proceed under the JAMS consumer rules."  (Lynch Decl., Ex. A.)  Zynga's counsel responded: "You can find Take-Two's Terms of Service ('TOS'), here[3]. It explains our client's arbitration procedure."  (*Id.*, Ex. B.)

The next day, Plaintiff's counsel conceded that arbitration under JAMS was appropriate under the governing TOS and stated that they would commence with arbitration, writing: "[c]learly your terms of service indicate an arbitration under the consumer rules. **We will file a demand next week**."  (*Id.*, Ex. C.) (emphasis added).

Thereafter—but before Plaintiff filed his Initial Complaint—the only communications between Plaintiff's and Zynga's counsel focused on a disagreement over which JAMS rules would govern the arbitration: the Streamlined Rules expressly provided in the TOS—which

---

[3] Defendant hyperlinked Plaintiff to Zynga's Terms of Service page.

9

Plaintiff admits he agreed to (SAC ¶ 80, 89)—or the Comprehensive Rules that Plaintiff's counsel demanded:

> Please confirm that we will arbitrate under the JAMS consumer rules, which we hyperlinked below last week. As Zynga has been aware since November 2024 through our correspondence, (and since much earlier from our client's correspondence), the disputed amount far exceeds $250,000 and puts the dispute outside the streamlined arbitration rules. We trust our months-long back and forth in good faith satisfies the required pre-demand notice.
>
> If we do not hear from you confirming the JAMS consumer-ruled arbitration by end of day tomorrow, we will proceed by filing our complaint in SDNY. We have discussed our rationale as to why this dispute is outside the scope of the mandatory arbitration clause.

(*Id.*, Ex. D.).  Zynga's counsel responded on March 5, 2025, reiterating that arbitration was required and confirming that Zynga intended to follow the rules set forth in the governing TOS:

> We understand that your client is eager to move forward, and we remain committed to resolving this matter through arbitration as required by Take-Two's Terms of Service ("TOS"). As you are aware, the governing TOS specifies that the JAMS Streamlined Arbitration Rules apply. While we acknowledge your position, our client is not inclined to deviate from the agreed-upon procedure, at least until we have reviewed your proposed pleading. If your client believes the Comprehensive Rules should govern, that is an issue to be raised in the arbitration demand. If you intend to proceed under the position that arbitration should be governed by the Comprehensive Rules, Take-Two reserves all rights to challenge any fees exceeding those provided for under the Streamlined Rules before the arbitrator.

(*Id.*, Ex. E.)

But Plaintiff failed to respond to Zynga, and instead filed his Initial Complaint five days later in this Court.  (ECF No. 1.)  The next day, Zynga wrote to Plaintiff again "to remind [him] that this dispute is subject to mandatory arbitration."  (Lynch Decl. Ex. F.)

On March 12, 2025, Plaintiff responded that notwithstanding any purported defenses, their "client has agreed to arbitrate" if Zynga agreed that the "JAMS consumer rules, which are clearly appropriate in this matter" would apply to the arbitration:

10

> As you know, our position is that the nature of our client's claims takes this dispute outside the scope of the TOS and the mandatory arbitration clause is inapplicable.
>
> Notwithstanding the above, you are also aware that **our client has agreed to arbitrate under the JAMS consumer rules, which are clearly appropriate in this matter**. You appear to disagree. Our client is unable to bear the costs of arbitration if not under these rules (which is, as you know, a separate basis to invalidate a mandatory arbitration provision). If your position has changed, and your clients agree to arbitrate under the JAMS consumer rules, **we will agree to withdraw the complaint in its entirety and proceed under JAMS consumer rules**.

(*Id.*, Ex. G) (emphasis added).

That same day, Zynga explained that there was no real disagreement between the parties because the JAMS consumer rules, *i.e.*, the JAMS Consumer Arbitration Minimum Standards "apply to all consumer arbitrations":

> Additionally, there is no separate set of "JAMS Consumer Rules." Rather, the JAMS Consumer Arbitration Minimum Standards apply to all consumer arbitrations, regardless of whether they proceed under Comprehensive or Streamlined Rules. Under these standards, a consumer's filing costs are capped at $250, with the company covering all other arbitration fees—an amount notably lower than the $400 filing fee your client has already paid to initiate litigation in federal court.

(*Id.*, Ex. H.)

On March 13, 2025, Plaintiff stated again that he "will agree to arbitrate" if Zynga does not challenge the applicability of the JAMS Consumer Arbitration Minimum Standards:

> To be clear, **if your client agrees not to challenge the JAMS consumer minimum standards** governing an arbitration of this dispute - meaning your client will bear arbitration costs and fees - **we will agree to arbitrate**. Please let us know.

(*Id*. Ex. I) (emphasis added).

On March 14, Zynga reiterated that the JAMS Consumer Arbitration Minimum Standards would apply to the arbitration:

> **Yes, to confirm, arbitration will proceed under the JAMS Consumer Arbitration Minimum Standards, which apply to all consumer arbitrations, regardless of whether they follow the Comprehensive or Streamlined Rules.   The consumer's contribution remains capped at $250, with the company covering the remaining arbitration costs.**
>
> However, as per Take-Two's TOS, the arbitration will proceed under JAMS Streamlined Rules, which were contractually agreed upon.  Please confirm that we are in agreement on this and if so, voluntarily dismiss your action against Zynga and Take-Two and file an arbitration demand.

(*Id*. Ex. J) (emphasis added).

Yet, despite reaching a crystal-clear understanding that this dispute should be in arbitration and agreement that the JAMS Consumer Arbitration Minimum Standards would apply, Plaintiff inexplicably changed tack and filed his First Amended Complaint, followed by his Second Amended Complaint.

### PLAINTIFF'S ALLEGATIONS

Plaintiff alleges that *Zynga Poker*'s "representations and guarantees about the fairness of its online poker game" were deceptive and misleading.  (SAC ¶¶ 1, 4.)  He claims that, over more than 150,000 rounds of gameplay, he observed "patterns and card-dealing sequences that…would have an astronomically low probability of occurring randomly," including an alleged overabundance of "action flops" and statistically improbable "matching hands."  (*Id.* ¶¶ 5, 33, 38, 41.)  Plaintiff further claims that *Zynga Poker* "structures flops, turns, and rivers to ensure continued engagement," which he alleges constitutes an "unfair ploy" to induce users to bet more.  (*Id.* ¶¶ 39–40.)

Plaintiff also alleges that Zynga's platform includes non-human "bots" designed to inflate user bets by predicting card outcomes or knowing players' cards.  (*Id.* ¶¶ 50–53.)  He claims these alleged 'features' contradict Zynga's public representations and its TOS, which he says falsely guarantee fairness, randomness, and human-only gameplay.  (*Id.* ¶¶ 26–31, 51–53.)

12

Plaintiff avers that "[b]ut for Defendant's public (and false) representations," he would not have accepted the TOS, played the game, or spent money on *Zynga Poker*. (*Id.* ¶ 48.)

The SAC asserts causes of action against Zynga for (1) deceptive business practices under N.Y. Gen. Bus. Law § 349, (2) false advertising under N.Y. Gen. Bus. Law § 350, (3) fraudulent inducement, (4) fraudulent concealment, and (5) civil conspiracy to defraud. (*Id.* ¶¶ 61–98.)

Each of these claims arises from Plaintiff's experience playing *Zynga Poker* and are subject to Zynga's TOS and the Arbitration Agreement he accepted. (*Id.* ¶¶ 3, 15, 32, 80.)

## LEGAL STANDARD

The Arbitration Agreement between Plaintiff and Zynga is governed by the FAA. *See Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 442 (2006); *Micheli & Shell, LLC v. Grubhub Inc.*, 588 F. Supp. 3d 483, 489 (S.D.N.Y. 2022) (internal citations omitted) ("Under the Federal Arbitration Act ('FAA') parties may contract to arbitrate their disputes, and such agreements are 'valid, irrevocable, and enforceable.'"); (Ex. 1, at 23–24). The FAA provides that a contract "evidencing a transaction involving commerce to settle by arbitration . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. Section 2 reflects a "'liberal federal policy favoring arbitration,' and the 'fundamental principle that arbitration is a matter of contract, *Thus, courts must place arbitration agreements on an equal footing with other contracts, and enforce them according to their terms*." *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011) (internal citations omitted) (emphasis added).

"In a motion to compel arbitration, the court applies a summary judgment standard that is not limited to the face of the pleadings . . . [and] facts are drawn from the pleadings *as well as the attachments to the pleadings*." *Ralph Lauren Corp. v. U.S. Polo Ass'n, Inc.*, No. 13 CIV.

13

7147, 2014 WL 4377852, at *1 (S.D.N.Y. Sept. 4, 2014) (internal citations omitted) (emphasis added).  Typically, a court considering a motion to compel arbitration has a limited set of tasks: (1) to determine whether parties agreed to arbitrate; (2) if they did, determine "'whether the dispute falls within the scope of the arbitration agreement.'"  *Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 73–74 (2d Cir. 2017) (quoting *Specht v. Netscape Commc'ns Corp.*, 306 F.3d 17, 26 (2d Cir. 2002)); and (3) "'if some, but not all, claims are subject to arbitration, whether to stay [rather than dismiss] the balance of the proceedings pending arbitration.'"  *See Begonja v. Vornado Realty Tr.*, 159 F. Supp. 3d 402, 409 (S.D.N.Y. 2016) (citing *Guyden v. Aetna, Inc.*, 544 F.3d 376, 382 (2d Cir. 2008)).

A court's review is even further limited where, as here, the arbitration agreement contains a delegation clause.  *Lewis v. Samsung Elecs. Am., Inc.*, No. 1:22-CV-10882 (JLR), 2023 WL 7623670, at *11 (S.D.N.Y. Nov. 14, 2023).  Before reaching gateway issues relating to the validity and scope of an arbitration agreement, as well as other questions of arbitrability, a court must first determine whether the parties agreed to commit threshold questions of arbitrability to the arbitrator.  *See Rent-A-Ctr., W., Inc. v. Jackson*, 561 U.S. 63, 70 (2010); *see also Henry Schein, Inc. v. Archer & White Sales, Inc.*, 586 U.S. 63, 69 (2019) ("To be sure, before referring a dispute to an arbitrator, the court determines whether a valid arbitration agreement exists.").  If the parties have clearly and unmistakably agreed to delegate questions of arbitrability (including, for example, questions of applicability, enforceability, and formation) to the arbitrator, a court must send the determination of these issues to the arbitrator even if the court thinks the arguments in favor of arbitrability are "wholly groundless."  *Schein*, 586 U.S. at 68–71 (holding courts may not override delegation clauses); *see also Cloney's Pharmacy, Inc. v. Wellpartner, Inc.*, No. 1:23-CV-10088-MKV, 2024 WL 4349291, at *8 (S.D.N.Y. Sept. 30, 2024).

Additionally, "[i]t is well settled that a claim or defense of fraudulent inducement, when it challenges generally the enforceability of a contract containing an arbitration clause rather than *specifically the arbitration clause itself*, may be subject to arbitration." *ACE Cap. Re Overseas Ltd. v. Cent. United Life Ins. Co.*, 307 F.3d 24, 29 (2d Cir. 2002) (emphasis added) (citing *Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 403–04 (1967)).

Further, "[t]he 'party to an arbitration agreement seeking to avoid arbitration generally bears the burden of showing the agreement to be inapplicable or invalid.'" *Lee v. Engel Burman Grande Care at Jericho, LLC*, No. 20CV3093-RPK-RER, 2021 WL 3725986, at *3 (E.D.N.Y. Aug. 23, 2021) (quoting *Harrington v. Atl. Sounding Co.*, *Inc.*, 602 F.3d 113, 124 (2d Cir. 2010)).

Finally, "[w]hen all of the claims in an action are arbitrable a Court may dismiss the action rather than stay the proceedings." *Teta v. Go New York Tours, Inc.*, 738 F. Supp. 3d 502, 510 (S.D.N.Y. 2024) (internal citation omitted).  However, when a district court finds that a dispute is arbitrable and a party requests a stay, the FAA compels the court to stay proceedings. *Xiaohong v. Dingledine*, No. 23 CIV. 11094 (GHW) (RFT), 2025 WL 1604001, at *5 (S.D.N.Y. June 6, 2025) (citing *Smith v. Spizzirri*, 601 U.S. 472, 475-76 (2024).)

## ARGUMENT

Plaintiff and Zynga entered into a valid and enforceable Arbitration Agreement (*at the very least*) when Plaintiff played the *Zynga Poker* App on March 20, 2024, and agreed to Zynga's TOS.  (Lam Decl. ¶ 22; *see also* SAC ¶¶ 80, 89.)  And Plaintiff continuously reaffirmed his assent to the Arbitration Agreement each time he logged in to the *Zynga Poker* App.  (Lam Decl. ¶¶ 22–25.)

Courts in this Circuit and around the country have routinely enforced consumers' agreements to arbitrate their claims where, as here, users are presented with an opportunity to

15

review a website or application's applicable terms, which include an arbitration clause, and agree to those terms of service. (*See Infra*. pp. 18-20.) This Court should do the same.

Further, this Court need not consider whether Plaintiff's claims fall within the scope of the Arbitration Agreement because that threshold question is delegated to the arbitrator. (Ex. 1, at 21.) Even if the Court were to reach that issue—which it should not—the Agreement is drafted in broad terms that cover the claims lodged by Plaintiff against Zynga. (*Id*. at 1–2, 21.) Thus, the Court should compel all of Plaintiff's claims to arbitration and dismiss the SAC.

### A.      Plaintiff And Zynga Entered Into A Valid Arbitration Agreement.

As an initial matter, not only does Plaintiff admit in the SAC that he accepted and agreed to Zynga's TOS (SAC ¶¶ 80, 89), but he also *conceded* that he "agreed to arbitrate under the JAMS consumer rules, which are clearly appropriate in this matter." (Lynch Decl. Ex. G.) Plaintiff further stated multiple times, both before and after the filing of the Initial Complaint, that he will agree to arbitrate. (*Id*. Exs. C, I.)

Plaintiff's only apprehension with proceeding with arbitration was that "the disputed amount [of Plaintiff's claims] far exceeds $250,000 and puts the dispute outside the streamlined arbitration rules" and "that the nature of [his] claims takes this dispute outside the scope" of the Arbitration Agreement. (*Id*. Exs. D, G.) But whether or not Plaintiff is correct that his claim is "outside the scope" of the Arbitration Agreement is of no moment because the Arbitration Agreement expressly delegates "exclusive authority to resolve any Disputes, including those related to the interpretation, applicability, enforceability, or formation of this Arbitration Agreement, and any claim that all or part of the Arbitration Agreement is void or voidable." (Ex. 1, at 21).[4]

---

[4] Plaintiff's monetary-based scope argument is also unavailing in light of the plain language of the TOS, which explicitly defines "[d]ispute" to include any dispute "related to the formation, breach, termination, enforcement,

There is no doubt, through Plaintiff's unequivocal admissions in his SAC and in correspondence with Zynga's Counsel that he assented to the TOS, agreed to arbitrate, and that he did so knowingly. And the record confirms that Plaintiff was conspicuously presented with—and assented to—Zynga's TOS, which included the Arbitration Agreement and that he was not coerced into assenting to the terms or the agreement.

Plaintiff concedes that he "agreed to [Zynga's] terms of service." (SAC ¶¶ 80, 89). On March 20, 2024, Plaintiff accessed the *Zynga Poker* App, which presented him with a two-step login flow. (Lam Decl. ¶¶ 13, 22.) After launching the app, Plaintiff was presented with a screen where he had to either log in with an existing account or create a new account. (*Id*. ¶ 13.) He was *required* to click on one of the buttons to proceed to the next page, which—directly above the account access buttons—presented him with a persistent banner that informed Plaintiff that: "[b]y clicking one of the buttons below, you agree to Zynga's Terms of Service." (*Id*. ¶¶ 14–15.) The phrase "Terms of Service" was hyperlinked, underlined, and appeared in bright purple font. (*Id*. ¶ 16.) Clicking the hyperlink would have directed Plaintiff to the then-current version of Zynga's TOS and the Arbitration Agreement. (*Id*. ¶ 17.) *Plaintiff could not play Zynga Poker unless and until he clicked one of the buttons presented below the fixed banner*. (*Id*. ¶ 18.) The banner's hyperlink to the TOS that Plaintiff agreed to unambiguously and unequivocally included a mandatory Arbitration Agreement.

Here, under relevant state law, Plaintiff clearly manifested his assent to both the TOS and Arbitration Agreement when he accessed his *Zynga Poker* account through the *Zynga Poker* App

---

**scope**, validity, or applicability of the Agreement." Ex. 1 at 21 (emphasis added). And to the extent that Plaintiff also (vaguely) suggests that his fraud-based claims "takes this dispute outside the scope" of the Arbitration Agreement (*id*. Ex. G)—that argument is legally baseless for the reasons explained in Section B below.

on March 20, 2024, and every instance thereafter when he logged in to play the game on the App.  (*Id.* ¶¶ 22-26; *supra* pp. 3-7.)

"Because an agreement to arbitrate is a creature of contract[,] the ultimate question of whether the parties agreed to arbitrate is determined by state law."  *Bell v. Cendant Corp.*, 293 F.3d 563, 566 (2d Cir. 2002).  Here, the TOS call for the application of New York law.  (Ex. 1, at 19.)  Plaintiff also concedes that "upon information and belief, the events or omissions giving rise to the claims occurred in the Southern District of New York."  (SAC ¶ 13.)  Thus, there is no question that principles of New York contract law govern.

New York courts find that consumers manifest assent to terms where, as here, they take an action such as clicking a button—here, for instance clicking "[c]reate Zynga Poker Account," "[s]ign in with Apple," "[p]lay as Guest," or "[l]ogin with Facebook"—after being informed that, by doing so, they are agreeing to certain terms.  *Bernardino v. Barnes & Noble Booksellers, Inc.*, No. 17-CV-04570 (LAK) (KHP), 2017 WL 7309893, at *8 (S.D.N.Y. Nov. 20, 2017), *R. & R. adopted as modified*, No. 17-CV-4570 (LAK), 2018 WL 671258 (S.D.N.Y. Jan. 31, 2018); *Meyer*, 868 F.3d at 79–80 ("A reasonable user would know that by clicking the registration button, he was agreeing to the terms and conditions accessible via the hyperlink, whether he clicked on the hyperlink or not."); (Lam Decl. §§ 14-18.) The terms that Plaintiff concedes he accepted included the binding Arbitration Agreement.

Such terms or agreements—coined in New York as "sign-in-wraps"—describe a hybrid between clickwrap and browsewrap agreements.  *Bernardino*, 2017 WL 7309893, at *3 (citing *Berkson v. Gogo LLC*, 97 F. Supp. 3d 359, 399–401 (E.D.N.Y. 2015)).  Sign-in-wraps do not require the user to click a box to establish acceptance of the terms—instead they require that the user is notified of the existence and applicability of the terms during the sign-in or login process.

18

*Id.* New York courts have continuously upheld, and very recently reaffirmed, the validity of such agreements. *See, e.g.*, *Kern v. StubHub Inc.*, No. 24 CIV. 871 (AT), 2024 WL 5283923, at \*3-4 (S.D.N.Y. Dec. 17, 2024); *Meyer*, 868 F.3d at 71–81 (2d Cir. 2017).

This accepted practice of contractual assent is not new and, in fact, courts in this Circuit and around the country have consistently found that consumers validly assent to a website's or application's applicable terms and agreements to arbitrate through "modified clickwrap" agreements like the one Plaintiff accepted. *Fteja v. Facebook, Inc.*, 841 F. Supp. 2d 829, 840 (S.D.N.Y. 2012) (enforcing a modified clickwrap agreement where "[plaintiff] was informed of the consequences of his assenting click and he was shown, immediately below, where to click to understand those consequences"); *Shirley v. Rocket Mortgage*, No. 2:22-cv-13007, 2022 WL 2541123, at \*4 (E.D. Mich. July 7, 2022); *Swift v. Zynga Game Network, Inc.*, 805 F. Supp. 2d 904, 912 (N.D. Cal. 2011); *Troia v. Tinder, Inc.*, No. 4:19-CV-1647 RLW, 2020 WL 619855, at \*3 (E.D. Mo. Feb. 10, 2020); *Jones-Bey v. JPay Inc.*, No. 2:17-CV-12545, 2019 WL 6337770 at \*7 (E.D. Mich. Oct. 10, 2019), *R. & R. adopted*, No. 17-12545, 2019 WL 6329666 (E.D. Mich. Nov. 26, 2019); *Coulter v. Experian Info. Sols., Inc.*, No. 20-CV-1814, 2021 WL 735726, at \* 5 (E.D. Pa. Feb. 25, 2021).

In New York, such agreements often require courts to determine whether the plaintiff was put on inquiry notice, which "often turns on whether the contract terms were presented to the offeree in a clear and conspicuous way." *Garcia v. Nabfly, Inc.*, No. 23 Civ. 1162 (PGG), 2024 WL 1795395, at \*5 (S.D.N.Y. Apr. 24, 2024) (internal citations omitted). The Second Circuit instructs district courts to evaluate inquiry notice by considering whether:  (1) the contract terms are presented on an uncluttered interface; (2) the terms are closely associated with the method of

assent (e.g., a button or check box); (3) the terms are immediately visible without scrolling; and (4) the transaction contemplates a continuing relationship governed by terms and conditions. *Id*.

Further, courts have repeatedly held that a user's ability to access or use a website or application *only after* manifesting assent is sufficient to establish an agreement—even if the user later claims not to recall doing so. *Kutluca v. PQ New York Inc.*, 266 F. Supp. 3d 691, 702 (S.D.N.Y. 2017) (finding assent where plaintiffs had no recollection of agreeing to terms but where "the evidence demonstrates that [p]laintiffs could not have proceeded to use the [application] . . . unless they accepted the [terms]."); *Plazza v. Airbnb, Inc.*, 289 F. Supp. 3d 537, 553 n.25 (S.D.N.Y. 2018) (finding a modified clickwrap agreement enforceable where plaintiff had no recollection of agreeing to the terms and "[d]efendant's description of the sign-up screens comport[ed] with [plaintiff's lack of] recollection" of clicking a button to assent).

Zynga's method of presenting its TOS and informing players of the consequence of that—entering into a binding Arbitration Agreement—on the *Zynga Poker* App satisfies every factor the Second Circuit instructs courts to consider when evaluating inquiry notice:  (1) the TOS was clearly linked in a distinct, fixed banner; (2) the notice appeared directly above the buttons in the *Zynga Poker* App, (3) the entire screen—which included the hyperlink—was fully visible without scrolling; and (4) the transaction contemplates a continuing relationship governed by terms because Plaintiff "located and downloaded the [*Zynga Poker*] App, signed up for an account, and" made purchases of Virtual Currency on *Zynga Poker* throughout 2024 and 2025 "with the intention of entering into a forward-looking relationship with [Zynga]." *Meyer*, 868 F.3d 66, 80; (Lam Decl. ¶¶ 15–19, 23.)  Further, the phrase "Terms of Service" in the fixed banner appeared in bright purple font (distinct from the rest of the font color of the other words that surrounded it) and was underlined, clearly indicating it was a hyperlink to Zynga's TOS,

20

which included the Arbitration Agreement. (*Id*. ¶ 16.) Plaintiff expressly agreed to the TOS (SAC ¶¶ 80, 89) and was confronted with the persistently fixed banner that clearly contained the TOS that notified him of the binding Arbitration Agreement he was agreeing to *every time* he logged into the *Zynga Poker* App. (Lam Decl. ¶ 19.)

Additionally, the Arbitration Agreement expressly provided Plaintiff with a clear opportunity to opt out. (Ex. 1, at 22.) But Zynga's records confirm that Plaintiff never submitted an opt-out notice. (Lam Decl. ¶ 26.)[5]

Accordingly, this Court should find that Plaintiff assented to Zynga's TOS and the Arbitration Agreement and compel all of his claims to arbitration.

### B.    The Arbitration Agreement's Broad Language Covers Plaintiff's Claims

Where—as here—the parties have clearly and unmistakably delegated gateway issues to an arbitrator, courts are not permitted to "short-circuit the process and decide the arbitrability question themselves." *Henry Schein*, 586 U.S. at 65–66. But even if the Court were to reach the "arbitrability question," the Arbitration Agreement unquestionably encompasses the claims at issue in Plaintiff's SAC.

The SAC asserts causes of action against Zynga for (1) deceptive business practices under N.Y. Gen. Bus. Law § 349, (2) false advertising under N.Y. Gen. Bus. Law § 350, (3) fraudulent inducement, (4) fraudulent concealment, and (5) civil conspiracy to defraud. (SAC ¶¶ 61–98.) But *all* of Plaintiff's grievances relate to Zynga's alleged 'misrepresentations and omissions' regarding *Zynga Poker*—nothing more. (*Id.* ¶¶ 1, 4, 6–7, 19, 21, 24–31, 33–60). Accordingly, even if there was any kernel of truth to any of Plaintiff's claims—which there is not—Plaintiff unequivocally agreed to arbitrate all such disputes with Zynga.

---

[5] Even assuming Plaintiff had opted out of the specific Arbitration Agreement at issue (which he did not), he would have been bound by a prior version of the TOS—by which he had already agreed during his earlier gameplay.

The Arbitration Agreement defines "Dispute" to include "any dispute, claim, or controversy arising from or related to [Zynga's] Services, including those related to the formation, breach, termination, enforcement, scope, validity, or applicability of the Agreement or the Arbitration Agreement, or your rights under those agreements." (Ex. 1, at 21.)

In the Second Circuit, where—as here—"[i]n situations involving such broad clauses, there is a *presumption of arbitrability* … [and t]he Court will compel arbitration of even a dispute that does not implicate the contract's express provisions as long as the claim alleged implicates issues of contract construction or the parties' rights and obligations under it." *Branch v. ATR New York LH, Inc.*, No. 2:23-CV-09456 (JMA) (LGD), 2025 WL 1400063, at *3 (E.D.N.Y. May 14, 2025) (internal quotation marks omitted) (emphasis added).

In *Micheli & Shell, LLC v. Grubhub Inc.*, this Court recently found that virtually identical broad language in the TOS at issue there "plainly delegate[d] the question of arbitrability to the arbitrator." 588 F. Supp. at 490. The arbitration agreement in *Micheli* read "[t]he arbitrator, and not any federal, state, or local court or agency, shall have exclusive authority to resolve any dispute relating to the interpretation, applicability, enforceability or formation of this Arbitration Agreement, including, but not limited to any claims that all or any part of this Arbitration Agreement is void or voidable." *Id.* at 487–88 (alteration in original). It would be an *understatement* to say there is practically no daylight between the TOS language upheld in *Micheli* to that found in Zynga's TOS.[6]

Additionally, the Arbitration Agreement here incorporated JAMS Rules—which Plaintiff explicitly agreed is "appropriate" to resolve the parties' disputes. (Lynch Decl., Ex. G) ("*our*

---

[6] Zynga's Arbitration Agreement reads: "The arbitrator – not a federal, state, or local court, or government agency – shall have exclusive authority to resolve any Disputes, including those related to the interpretation, applicability, enforceability, or formation of this Arbitration Agreement, and any claim that all or part of the Arbitration Agreement is void or voidable." (Ex. 1, at 21.)

22

*client has agreed to arbitrate under the JAMS consumer rules, which are clearly appropriate in this matter.*") (emphasis added).  But even if the Plaintiff had not made such an admission, courts in this District—and across the country—have consistently held that incorporation of the JAMS Rules constitutes "clear and unmistakable evidence that the parties delegated questions of arbitrability to the arbitrator."  *Mackris v. O'Reilly*, No. 17 CIV. 9483 (DAB), 2019 WL 11000205, at *6 (S.D.N.Y. Mar. 6, 2019) (internal quotation marks omitted); *see also Parrella v. Orange Rabbit, Inc.*, No. 20-CV-9923 (RA), 2021 WL 4462809, at *9 (S.D.N.Y. Sept. 29, 2021); *Ciccio v. SmileDirectClub, LLC*, 2 F.4th 577, 583 (6th Cir. 2021); *Richardson v. Coverall N. Am., Inc.*, 811 F. App'x 100, 103 (3d Cir. 2020); *Brennan v. Opus Bank*, 796 F.3d 1125, 1130–31 (9th Cir. 2015); *JPay, Inc. v. Kobel*, 904 F.3d 923, 937–38 (11th Cir. 2018).  Accordingly, the parties clearly and unmistakably agreed to delegate threshold issues to an arbitrator because the Arbitration Agreement incorporates the JAMS Rules.

Finally, in an effort to escape Plaintiff's assent to (and acknowledgement of) the TOS and the Arbitration Agreement, Plaintiff alleges that "[b]ut for Defendant's public (and false) representations, [he] would not have accepted the terms of service to play, played, or spent his money on Zynga Poker."  (SAC ¶ 48; *see also id.* ¶¶ 80, 89 for similar allegations in Plaintiff's fraudulent inducement and fraudulent concealment causes of action.)

But "[c]laims regarding fraud in a contract containing an arbitration clause are . . . subject to arbitration."  *Garten v. Kurth*, 265 F.3d 136, 142 (2d Cir. 2001).  A court may only retain jurisdiction over an otherwise arbitrable dispute where there is "*some substantial relationship between the fraud or misrepresentation and the arbitration clause in particular.*"  *Weiss v. Travex Corp.*, No. 02 CIV. 2380 (SAS), 2002 WL 1543875 at *2 (S.D.N.Y. July 12, 2002) (emphasis added) (quoting *Campaniello Imports, Ltd. v. Saporiti Italia S.p.A.*, 117 F.3d 655, 667 (2d Cir.

1997)).  "If there is no evidence of fraud specific to the arbitration clause, 'the court shall make an order directing the parties to proceed to arbitration in accordance with the terms of the agreement.'"  *Id*. (quoting *Gartem*, 265 F.3d at 142); *see also Dowe v. Leeds Brown L., P.C.*, 419 F. Supp. 3d 748, 759 (S.D.N.Y. 2019) (quoting *Buckeye*, 546 U.S. at 445–46); *ACE Capital*, 307 F.3d at 29; *Ipcon Collections LLC v. Costco Wholesale Corp.*, 698 F.3d 58, 61 (2d Cir. 2012).

Plaintiff's SAC says *nothing* about the Arbitration Agreement itself.  Instead, his fraud-based claims challenge only alleged misrepresentations about his gameplay experience—such as the presence of bots, the design of an algorithm, the manipulation of odds, and the lack of randomized card dealing.  (SAC ¶¶ 74–91.)  None of Plaintiff's allegations suggest that his assent to the Arbitration Agreement was fraudulently procured.  As the Supreme Court has made clear, even "where the alleged fraud that induced the whole contract equally induced the agreement to arbitrate which was part of that contract *[courts] nonetheless require the basis of challenge to be directed specifically to the agreement to arbitrate before the court will intervene*."  *Rent–A–Center, W., Inc.*, 561 U.S. at 71 (emphasis added).  Plaintiff has plainly failed to do so.

Thus, even if the Court were to consider the scope of the Arbitration Agreement (which it should decline to do), the result is the same: all of Plaintiff's claims must be compelled to arbitration.

### C.     The Court Should Dismiss or, in the Alternative Stay the Proceeding Pending Arbitration

Courts generally have the discretion to dismiss a case or stay its proceedings pending arbitration.  *See McPherson v. Bloomingdale's, LLC*, No. 23CV1084JMAARL, 2023 WL 8527462, at *7 (E.D.N.Y. Dec. 8, 2023) (deciding to stay the proceeding after the "[d]efendant requested a stay in the alternative to its request that [the] case be dismissed.); *Rost v. Liberty*

24

*Coca-Cola Beverages, LLC*, No. 20 CV 10559 (VB), 2021 WL 3723092, at *5 (S.D.N.Y. Aug. 23, 2021) ("When, as here, a defendant requests that an action be dismissed and requests a stay in the alternative, the Court 'has discretion in determining whether to stay or dismiss the case pending arbitration.'" (citation omitted)). However, "when a federal court finds that a dispute is subject to arbitration, and a party has requested a stay of the court proceedings pending arbitration, the court does not have discretion to dismiss the suit on the basis that all the claims are subject to arbitration; rather the FAA compels the court to stay the proceedings." *Xiaohong*, 2025 WL 1604001 at *5 (citing *Smith*, 601 U.S. at 475-76). Thus, if this Court determines that Plaintiffs' claims are arbitrable, but declines to dismiss the action, Defendant requests in the alternative a stay pending the outcome of the arbitration.

## CONCLUSION

For the foregoing reasons, Zynga respectfully requests that the Court grant its motion to compel arbitration and dismiss Plaintiff's SAC, or in the alternative, stay the case pending the outcome of arbitration.

Dated:  June 23, 2025

Respectfully submitted,

By: */s/ Michael C. Lynch*
    Michael C. Lynch
    Tal Ben-Moshe
    Kelley Drye & Warren LLP
    3 World Trade Center
    175 Greenwich Street
    New York, New York 10007
    Telephone:  (212) 808-7800
    Facsimile:  (212) 808-7897
    mlynch@kelleydrye.com
    tben-moshe@kelleydrye.com

    *Attorneys for Zynga Inc.*

25

**TYPE-VOLUME CERTIFICATION**

Pursuant to Local Civil Rule 7.1(c), I hereby certify that this Memorandum of Law in Support of Defendant Zynga Inc.'s Motion to Compel Arbitration contains 7,347 words, which complies with the word count limitations of Local Civil Rule 7.1(c).  This certification was prepared in reliance on the word count function of the word processing system (Microsoft Word) used to prepare this document.

Dated:  June 23, 2025                                Respectfully submitted,

                                                        By:  /s/ *Michael C. Lynch*